# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 14-cr-226(1) (PJS/TNL) |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Brian Todd Gore, | |
| Defendant. | |

Sarah E. Hudleston, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Douglas Olson, Assistant Federal Defender, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Defendant).

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 26) and Motion to Suppress Statements, Admissions, and Answers (ECF No. 27). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Patrick J. Schiltz, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1(a)(3).

A hearing was held on September 8, 2014. Assistant United States Attorney Sarah E. Hudleston appeared on behalf of the United States of America (the Government). Assistant Federal Defender Douglas Olson appeared on behalf of Defendant Brian Todd Gore.

The Court heard testimony from Special Agent Jonathan Duzan with Homeland Security Investigations. The Court received the following exhibits: Government Exhibit 1, an audio recording of a September 14, 2012 interview with Defendant, and Government Exhibits 2, 3, and 4, completed consent-to-search forms for an Astro van, a home in Inver Grove Heights, and a storage unit in Iowa, respectively.

Post-hearing briefing is now complete and these motions are ripe for a determination by the Court.

## I.

Based upon the file and documents contained therein, along with the testimony presented and exhibits received, the undersigned Magistrate Judge makes the following:

## FINDINGS

On September 14, 2012, Special Agent Duzan was involved in the execution of search warrant at AME Sports located inside Rosedale Mall in Roseville, Minnesota. The search warrant was part of an ongoing investigation into counterfeit sports apparel. In connection with that investigation, law enforcement had previously spoken with the store's owner, who stated that he had obtained counterfeit jerseys from Defendant in the past. While the search warrant was being executed, Special Agent Duzan and Minnesota State Patrol Captain Jay Swanson spoke with the store's owner in the backroom. The store's owner stated that Defendant was due to deliver some Minnesota Twins jerseys later that same day. Prior to Defendant's arrival, law enforcement found approximately 83 counterfeit jerseys at AME Sports.

That afternoon, around 4:00 p.m., Defendant parked his van at the Rosedale Mall loading dock and exited carrying a brown cardboard box. The box was covered in yellow tape, consistent with other boxes Special Agent Duzan had observed containing counterfeit jerseys. The box also resembled other boxes Special Agent Duzan had observed at the DHL shipping hub addressed to the store's owner. Defendant carried the box into AME Sports, placed it on the counter, and began taking jerseys out of the box.

Special Agent Duzan approached Defendant and told Defendant that he wanted to discuss what was in the box. Initially, Defendant was quite agitated and Special Agent Duzan placed him in handcuffs. Special Agent Duzan explained in further detail why law enforcement was present. Defendant relaxed and Special Agent Duzan asked if Defendant would like to speak with law enforcement. Defendant, Special Agent Duzan, and Captain Swanson then went to an office-type area in the back of the store.

There was a small table in the office area. Before sitting down at the table, Special Agent Duzan asked Defendant if he would like the handcuffs removed and subsequently took off the handcuffs. The interview with Defendant was recorded. (Gov't Ex. 1.) Captain Swanson read Defendant his *Miranda* rights. (*Id.*) Defendant stated he understood his rights and agreed to speak with law enforcement. (*Id.*) Special Agent Duzan testified that by this point, Defendant had relaxed substantially and appeared willing to cooperate with law enforcement. The interview lasted approximately eight minutes. (*Id.*) Captain Swanson began the interview by asking Defendant his name and birthdate. (*Id.*) During the interview, Defendant stated that the counterfeit items he has "run in" came from China via DHL. (*Id.*) Defendant stated that he ordered the jerseys

3

online, which were then shipped to him after he sent money to the seller. (*Id.*) Defendant stated that the boxes were addressed to his father. (*Id.*) Defendant also stated that he had been "caught" selling counterfeit jerseys in Florida a few years ago. (*Id.*) In the course of the interview, Defendant also confirmed that a federal probationary term he was serving had expired approximately two weeks ago.

Captain Swanson asked whether Defendant had any jerseys out in his vehicle. (*Id.*) Defendant responded that all of the jerseys in his vehicle were "totally licensed." (*Id.*) Captain Swanson next asked how many jerseys Defendant had in his home. (*Id.*) Defendant stated that he had some old jerseys at his home. (*Id.*) Captain Swanson then asked Defendant if he would be willing to give consent to search his vehicle and his home and seize the jerseys. (*Id.*) Defendant responded, "Whatever's counterfeit you guys can take." (*Id.*) Defendant subsequently executed consent-to-search forms for his home and van. (Gov't Exs. 2, 3.)

Special Agent Duzan testified that, during the interview, Defendant appeared coherent and did not appear to be intoxicated or impaired in anyway. Special Agent Duzan further testified that Defendant maintained eye contact, appeared to understand the questions posed, and responded appropriately. Special Agent Duzan testified that neither he nor Captain Swanson raised their voices at Defendant or made any promises or threats to him.

While Defendant was speaking with Special Agent Duzan and Captain Swanson, other agents were counting, photographing, and identifying the jerseys inside the box Defendant brought in. These agents, who were trained to identify counterfeit sports

trademarks, determined that the jerseys that Defendant had brought in were counterfeit. Special Agent Duzan, who is also trained to recognize counterfeit sports apparel, likewise determined that the jerseys brought in by Defendant were counterfeit.

After the interview, law enforcement searched Defendant's van. In the van, they found approximately 773 counterfeit jerseys. Law enforcement also found several shipping labels addressed to Defendant's father from a Chinese source, some international wire payment forms, and a receipt for a storage unit in Iowa. When asked about the storage unit in Iowa, Defendant also executed a consent-to-search form for the storage unit.[1] (Gov't Ex. 4.)

Law enforcement next proceeded to Defendant's home. Defendant participated in the search of the residence, pointing out where the counterfeit jerseys were located. Law enforcement seized approximately 640 counterfeit jerseys from Defendant's home.

Iowa agents searched the storage unit the same day and found approximately 700 counterfeit jerseys along with 1,300 "blank" apparel items that did not bear any trademarks, names, symbols, etc. Special Agent Duzan testified that the blanks were seized initially because they were Majestic brand jerseys and Majestic owns the license for Major League Baseball jerseys.

In total, law enforcement seized approximately 2,000 counterfeit jerseys from Defendant on September 14.

---

[1] Special Agent Duzan testified at the hearing that there was an error in the date on the consent-to-search form for the storage unit. While the form is dated "8/14/12," it was actually signed on *September* 14, 2012, not *August* 14, 2012.

5

## II.

Based upon the foregoing Findings, the undersigned makes the following:

## CONCLUSIONS OF LAW

Defendant argues that the search and seizure of the box of jerseys he delivered to AME Sports violated his Fourth Amendment rights because (1) there was no warrant, (2) there was no exigency justifying the absence of a warrant, and (3) there was no probable cause to support the search and seizure of the jerseys. Based on this initial taint, Defendant contends that the interview with Special Agent Duzan and Captain Swanson was not voluntary and the consent to search his van, home, and storage unit was likewise involuntary. Defendant also contends that the law enforcement exceeded the scope of his consent in conducting the searches.

**A. Box of Jerseys**

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "A search occurs under the Fourth Amendment when . . 'the government violates a subjective expectation of privacy that society recognizes as reasonable.'" *Arzen v. Palmer*, 713 F.3d 369, 372 (8th Cir. 2013) (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001)).

"'The touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy.'" *United States v. McIntyre*, 646 F.3d 1107, 1111 (8th Cir. 2011) (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)). "The Fourth Amendment generally requires the government to obtain a warrant

before searching an area where an individual has a reasonable expectation of privacy." *United States v. Shafer*, 608 F.3d 1056, 1064 (8th Cir. 2010). "As a general rule, a search cannot violate a person's Fourth Amendment rights unless the person has a reasonable expectation of privacy in the place searched—whether it be a home, a car, or somewhere else." *United States v. Foster*, No. 10-cr-0049 (PJS/JJK), 763 F. Supp. 2d 1086, 1087 (D. Minn. 2011). Thus, "'[o]fficial conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment.'" *United States v. Scott*, 610 F.3d 1009, 1016 (8th Cir. 2010) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005) (internal quotation omitted)). "The question of whether a person has a constitutionally protected reasonable expectation of privacy in an area requires us to ask (1) whether the individual manifested a subjective expectation of privacy in the area; and (2) whether society is willing to recognize the expectation as reasonable." *United States v. Mathias*, 721 F.3d 952, 957 (8th Cir. 2013) (citing *Ciraolo*, 476 U.S. at 211).

AME Sports is a commercial establishment. "Notably, an expectation of privacy in commercial premises is different from, and indeed less than, a similar expectation in an individual's home." *United States v. Perry*, 548 F.3d 688, 691 (8th Cir. 2008) (quotation omitted). The Eighth Circuit has "f[oun]d it indisputable that someone present in a commercial establishment in an area open to the general public has no objectively reasonable expectation of privacy therein." *Id.* at 691; *accord Pace v. City of Des Moines*, 201 F.3d 1050, 1053 (8th Cir. 2000) ("We are aware that the Fourth Amendment provides no protection for what a person knowingly exposes to the public, even in his own home or office." (quotations omitted)).

7

As stated by the Government, "Defendant brought the box of jerseys into a public, commercial establishment and exposed it to any and all who may have observed him in the Rosedale Mall and AME Sports. He set the open box on the retail counter and began unloading the counterfeit jerseys he came to sell." (Gov't's Resp. to Def.'s Mots. to Suppress at 8, ECF No. 36.) Assuming *arguendo* that Defendant has established a subjective expectation of privacy in the box of jerseys, Defendant did not have an objectively reasonable expectation of privacy in the box or its contents once he placed the box on the counter at AME Sports and began unloading it. Because Defendant did not have an objectively reasonable expectation of privacy in the area inspected, there was no search under Fourth-Amendment standards, no warrant was required, and no constitutional violation resulted.

Because the Court concludes that Defendant did not have an objectively reasonable expectation of privacy in the box of jerseys, the Court does not address Defendant's arguments regarding exceptions to the warrant requirement or probable cause.

Moreover, even presuming Defendant had an objectively reasonable expectation of privacy in the box of jerseys, the plain-view exception to the warrant requirement applies. "Under the plain-view exception, officers may seize an object without a warrant if they are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object." *United States v. Muhammed*, 604 F.3d 1022, 1027 (8th Cir. 2010).

> "Immediately apparent" in the Fourth Amendment context means that the officer performing the search has probable cause to believe an item is incriminating. Probable cause does not require absolute certainty; it only requires that the facts available to a reasonable cautious man would warrant a belief that certain items may be contraband or stolen property or useful as evidence of the crime.

*Id.* at 1027-28 (quotations and citations omitted); *accord United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995) ("The 'immediately apparent' requirement means that officers must have probable cause to associate the property with criminal activity." (quotation omitted)).

As stated by the Government, "it is undisputed that[,] at the time Defendant arrived and began unloading jerseys on the counter at AME Sports, agents were lawfully conducting a search of that store pursuant to a valid search warrant. Thus, [law enforcement] did not violate the Fourth Amendment in arriving at their vantage point and had a lawful right of access to the box Defendant brought into the store." (Gov't's Resp. to Def.'s Mot. to Suppress at 10.) Further, the incriminating nature of the box and jerseys was immediately apparent. When Defendant arrived at AME Sports with the box of jerseys and began unloading them, law enforcement knew Defendant had supplied counterfeit jerseys to AME Sports in the past, Defendant was scheduled to deliver jerseys to AME Sports that afternoon, Defendant arrived that afternoon carrying a box resembling other boxes law enforcement had observed containing counterfeit jerseys, and Defendant began unpacking jerseys from the box. Based on these facts, law enforcement had probable cause to believe the box and jerseys were contraband and associated with criminal activity. Thus, even if Defendant had an objectively reasonable expectation of

privacy in the box of jerseys, law enforcement was permitted to seize and inspect the box of jerseys under the plain-view exception.

### B. Consent to Search

"If . . . [law enforcement] officers conduct an illegal search or detention, physical evidence from the search as well as verbal evidence obtained from the [search] must be excluded as the 'fruits' of the officers' unlawful action." *United States v. Cotter*, 701 F.3d 544, 547 (8th Cir. 2012) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)); *accord United States v. Yousif*, 308 F.3d 820, 832 (8th Cir. 2002) ("Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search.").

Defendant's argument that his statements to Special Agent Duzan and Captain Swanson and the consent given to search were tainted by the initial warrantless search of the box of jerseys and therefore involuntary fails on several grounds. First, the inspection of the box of jerseys was not illegal and, consequently, could not taint Defendant's statements or consent. Second, as the Government points out, "the search of the box did not take place until Defendant was in another room talking to [Special Agent] Duzan and Captain Swanson, and therefore could not have led to his statements." (Gov't's Resp. to Def.'s Mots. to Suppress at 11.) "[E]vidence should only be excluded if the illegality is at least a but-for cause of obtaining the evidence." *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011) (quotation omitted). The focus is on whether Defendant would have made the statements to law enforcement if there had been no illegal search.

10

*Id.* Defendant has made no showing that but for the inspection of the box of jerseys, he would not have agreed to talk with law enforcement. *See id.* ("In order to determine whether challenged evidence is the fruit of an illegal search or seizure, the defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence." (quotation omitted)).

Third, the record shows that Defendant voluntarily waived his *Miranda* rights and consented to the search of his van, home, and storage unit. A waiver of one's *Miranda* rights must be "voluntary, knowing, and intelligent." *United States v. Gayekpar*, 678 F.3d 629, 638 (8th Cir. 2012). Defendant challenges only the voluntariness of his statements and consent to search. "Statements and consent are involuntary where an individual's will is overborne by coercive police activity and he loses the capacity for self-determination." *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014). "Coercive police activity is a necessary predicate to finding that a confession is not voluntary within the meaning of the Due Process Clause. A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." *Id.* at 816 (quotations omitted); *accord United States v. Pape*, No. 12-cv-251 (PJS/LIB), 917 F. Supp. 2d 888, 895 (D. Minn. Jan. 7, 2013). Stated differently, a *Miranda* waiver is voluntary when it is "'the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Gayekpar*, 678 F.3d at 638 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). In examining whether a *Miranda* waiver was voluntary, courts examine the totality of the circumstances, including the conduct of law

enforcement and the individual's capacity to resist pressure to confess. *Id.*; *Pape*, 917 F. Supp. 2d at 895-96.

Similarly,

> [c]ourts ascertain voluntariness [of a defendant's consent to a search] by analyzing the totality of the circumstances, looking both to characteristics of the defendant (such as his age, general intelligence, level of intoxication, and likely awareness of his rights based on prior encounters with law enforcement) and the circumstances surrounding the request to search (such as whether law enforcement made the request in a public location, threatened the defendant, and *Mirandized* him prior to attempting to search the vehicle).

*United States v. Capps*, 716 F. 3d 494, 497 (8th Cir. 2013).

During the interview, Captain Swanson and Special Agent Duzan did not raise their voices when talking with Defendant, did not make threats or promises to Defendant, and did not use deceptive tactics. *See Williams*, 760 F.3d at 816. Captain Swanson read Defendant his rights and Defendant calmly responded that he understood them and was willing to answer questions. *See id.* There is no indication that Defendant was intoxicated or otherwise impaired and Defendant does not argue otherwise. *See id.* There is no indication that Defendant did not understand what was going on and, again, Defendant does not argue otherwise. *See id.* Accordingly, based on the totality of the circumstances, the Court concludes that Defendant voluntarily waived his *Miranda* rights and agreed to speak with law enforcement.

Defendant's consent to search his van, home, and storage unit was equally voluntary. As already discussed, (1) Defendant was read his *Miranda* rights prior to Captain Swanson asking whether Defendant would consent to the searches; (2) the

interview atmosphere was free of coercion, intimidation, and deception; and (3) Defendant did not appear to be under the influence of drugs or alcohol, suffering from a physical or mental impairment that would impede his understanding, or experiencing some sort of language barrier. *See Capps*, 716 F.3d at 497. The record also reflects that Defendant has had some prior experience with law enforcement based on his references to the recent expiration of a probationary term and having been "caught" in Florida with counterfeit sports memorabilia. *See id.*

As for the location of the requests for consent, the request to search Defendant's van and home was made while Defendant was in the office area of AME Sports and the request to search Defendant's storage unit was made while Defendant was outside, in a public parking lot. The storage-unit request took place in a public place. While the request to search Defendant's home and van were made in a public store, the request was made in an area of the store having more restricted access than the retail selling floor and, consequently, was more secluded. Nevertheless, Defendant was in this area for less than ten minutes. *See United States v. Dunning*, 666 F.3d 1158, 1165 (8th Cir. 2012) (fact that request to search took place in private cabin rather than public place where defendant was detained for less than five minutes did not render consent involuntary where remaining factors supported voluntary nature of consent).

Perhaps most importantly, when asked whether Defendant would be willing to consent to the search of his van and home, Defendant replied, "Whatever's counterfeit, you guys can take." (Gov't Ex. 1.) Defendant then signed the consent-to-search forms, which informed Defendant that he (1) had a "constitutional right not to have a search

made of the premises . . . specified without a search warrant"; (2) had a "right to refuse consent to the premises being searched without a search warrant";  (3) was "warned that anything discovered during . . . [the] search may be used against [him]"; (4) was informed that he could consult with an attorney before or during the search; and (5) could withdraw his consent to the "search at any time prior to its conclusion." (Gov't Exs. 2, 3, 4.)  Further, by signing the consent-to-search forms, Defendant represented that he gave his consent "voluntarily and without threats, promises, pressure, or coercion of any kind." (Gov't Exs. 2, 3, 4.)

Based on the totality of the circumstances, the Court concludes that Defendant voluntarily consented to the searches of his van, home, and storage unit.

**C. Scope of Consent**

Defendant's final argument is that the searches of his van, home, and storage unit exceeded his consent in two ways: "the consent forms . . . did not clearly specify the seizure of jerseys other than a generic statement at the end of the form permitting officers to take property," (Def.'s Mem. in Supp. at 3, ECF No. 35), and "the officers randomly seized apparel from all three locations regardless [of] whether it was 'legal' or 'illegal,'" (*id.* at 1).

As just discussed, Defendant voluntarily consented to the searches of his van, home, and storage unit.  "A consensual search[, however,] may not exceed the scope of the consent given.  The scope of consent for a search is limited to what a reasonable person would have understood by the exchange between the investigating officer and the person to be searched." *United States v. Dinwiddie*, 618 F.3d 821, 831 (8th Cir. 2010)

(quotation and citations omitted).  The Eighth Circuit has "held that when a person gives a general statement of consent to search . . . , the scope of consent includes the items about which he was specifically questioned."  *Id.*

The consent-to-search forms signed by Defendant authorized law enforcement to seize "any letters, papers, materials, or other items/property which they may desire." (Gov't Exs. 2, 3, 4.)  This authorization was given following a conversation with Defendant regarding counterfeit sports apparel, specifically jerseys, in which Defendant was asked about his activities with respect to counterfeit jerseys, Defendant was asked about having counterfeit jerseys in his van and home, and Defendant told law enforcement that they could take "[w]hatever's counterfeit . . . ."  (Gov't Ex. 1.)  Based on this exchange and the sequence of events, a reasonable person would have understood Defendant's consent to include the seizure of jerseys.  *See Dinwiddie*, 618 F.3d at 831.

The only evidence in the record of law enforcement seizing both "counterfeit" and "legal" jerseys is with respect to the jerseys in the storage unit.  Of the approximately 2,000 jerseys in the storage unit, roughly 1,300 of them were determined to be blank jerseys that were legally owned by Defendant.  As already discussed, Defendant voluntarily consented to the search of his storage unit.  These blank jerseys were inside the storage unit in large plastic totes along with the counterfeit jerseys.  Accordingly, law enforcement was lawfully in a position to both view the jerseys and access the jerseys. Law enforcement had received information from the owner of AME Sports that Defendant was supplying counterfeit sports apparel and that Defendant was due to arrive that day with additional jerseys; Defendant, in fact, arrived with a box of counterfeit

jerseys; and Defendant spoke with law enforcement about how he obtained the counterfeit jerseys and admitted to having additional counterfeit jerseys. Based on the earlier tip and the interview with Defendant, law enforcement had probable cause to believe that the jerseys in the storage unit were either counterfeit jerseys or evidence of Defendant's counterfeiting activities. *See Muhammed*, 604 F.3d at 1027-28; *Hatten*, 68 F.3d at 261. Therefore, the incriminating character of the jerseys was immediately apparent, and the plain-view exception permitted law enforcement to seize all of the jerseys and subsequently determine which jerseys were legal and which were counterfeit. *See Muhammed*, 604 F.3d at 1028 (plain-view exception permitted officer to seize wallet bulging with cash to determine whether cash included bills taken in bank robbery).

Defendant's arguments that the searches exceeded the scope of his consent are without merit.

[Continued on next page.]

## III.

Based upon the foregoing Findings and Conclusions, the undersigned Magistrate Judge makes the following:

## RECOMMENDATION

For the reasons set forth herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 26) be **DENIED**.

2. Defendant's Motion to Suppress Statements, Admissions, and Answers (ECF No. 27) be **DENIED**.

Date: October  23 , 2014                                    *s/ Tony N. Leung*
                                                            Tony N. Leung
                                                            United States Magistrate Judge
                                                            for the District of Minnesota

                                                            *United States v. Gore*
                                                            File No. 14-cr-226(1) (PJS/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **November 7, 2014**.