UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 14-226 (PJS/TNL)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) **GOVERNMENT'S POSITION WITH** |
| | ) **RESPECT TO SENTENCING** |
| v. | ) |
| | ) |
| BRIAN TODD GORE, | ) |
| | ) |
| Defendant. | ) |

## FACTS

Brian Gore (the "defendant") ran an illegal business supplying counterfeit sports jerseys. He used the alias "Sammy Walker" and called his operation "Prime Time Sports." (PSR ¶ 14). He purchased counterfeit goods from China and resold them in this country to various buyers, both in Minnesota and beyond. (PSR ¶¶ 7, 9, 10, 12, 14; Plea Agreement ¶ 2). In February 2010, defendant was caught in an undercover sting operation in Miami Florida, the site of the 2010 Super Bowl, where he had traveled to sell counterfeit National Football League jerseys. Defendant was released and he returned to Minnesota, where he continued his operations.

One of defendant's regular customers was R.M., the owner of AME Sports store in Roseville, Minnesota. Law enforcement authorities were aware of R.M. selling counterfeit apparel and on September 14, 2012, they executed a search warrant at AME Sports. During the search, agents interviewed R.M., who told them his main supplier, the defendant, was due to deliver goods later that day. As planned, defendant arrived at AME Sports that afternoon carrying a box containing 33 counterfeit sports jerseys.

Defendant consented to searches of his van, home, and storage unit and on that day alone was in possession of over 2000 pieces of counterfeit sports apparel: 33 in the box he delivered to R.M.; 773 in his van; 637 in his residence; and 696 in his storage locker in Iowa. (PSR ¶ 18). Agents seized these items and sent samples to the Coalition to Advance the Protection of Sports Logos (CAPS),[1] which confirmed that the goods bore counterfeit trademarks of the sports organizations they purported to represent. Defendant was cooperative with authorities and admitted that he purchased and resold sports jerseys he knew to be counterfeit.

On July 9, 2014, the grand jury returned a two-count Indictment against the defendant for the above-described conduct. On December 9, 2014, the defendant pled guilty to Count One of the Indictment charging him with conspiracy to traffic in counterfeit goods. The government shall move the Court to dismiss Count Two of the Indictment at the time of the sentencing hearing.

## SENTENCING GUIDELINES CALCULATION

As the Court well knows, it is to begin the sentencing determination by calculating the applicable guidelines range. Gall v. United States, 552 U.S. 38, 49 (2007). In this case, the parties agree on the guidelines assessments except with respect to infringement

---

[1] CAPS is an organization comprised of the Collegiate Licensing Company; MLB Properties, Inc.; NBA Properties, Inc.; NFL Properties, LLC; and NHL Enterprises, L.P. that addresses trademark protection and enforcement. (PSR ¶ 15). CAPS analyses are set forth in affidavits, which are part of the discovery in this case and shall be provided to the Court with the courtesy copies of this memorandum.

amount.  As set forth below, the government agrees with the Probation Officer's guidelines calculation and asks the Court to adopt the PSR's guidelines findings.

### A. Adjusted Offense Level

The PSR and the parties' plea agreement are in accord that the base offense level for conspiracy to traffic in counterfeit goods is 8 and that a two-point enhancement applies because the offense involved importation of the infringing goods.  (PSR ¶¶ 27, 29; Plea Agreement ¶¶ 6.a, 6.b.2).  The parties and the PSR likewise agree that defendant should receive a three-level decrease in offense level for his acceptance of responsibility, and the government will so move at the time of the hearing.  (PSR ¶¶ 35, 36; Plea Agreement ¶ 6.c).  As noted, the point of disagreement is the dollar amount assigned to defendant's infringement.

The PSR found that a 12-level increase applies because the infringement amount was $316,376.  (PSR ¶ 28).  Based on CAPS' analysis and valuation, the government calculated an infringement amount of $328,256.  (Plea Agreement ¶ 6.b.1).  The government hereby amends this figure to <u>$324,356</u>, having recognized an over-valuation of $100 each of the 39 NFL jerseys seized from defendant's van (mistakenly valued at $250, rather than $150, each).  The difference between the government's original ($328,256) and amended ($324,356) amount, like that between the government ($324,356) and PSR ($316,376) figures, is immaterial to the guidelines determination, as the infringement amount in either case is between $200,000 and $400,000, which triggers a 12-level increase.  U.S.S.G. §§ 2B.5.3(b)(1); 2B.1.1.  The defendant contests the PSR's

conclusion on valuation and argues for a lower adjusted offense level.  (See id.; PSR Addendum at A1).

The Court should adopt the infringement amount of $324,356, based on the CAPS valuations, and apply the resultant 12-level increase.  It is undisputed that infringement amount in this case is determined by the value of the infringed (i.e., legitimate) products at the time of the infringement.  U.S.S.G. § 2B5.3 Commentary Note 2(a)(i).  CAPS, an organization of experts in analysis and valuation of sports league trademarks, has attested to the figures underlying the government's infringement calculation.  See supra n. 1 & accompanying text.  Defendant's alternative infringement amount of $179,556 is based on two meritless contentions:  (1) that the Super Bowl jerseys seized in Miami had an infringement value of $260, rather than $300, per jersey and (2) that defendant did not know 1,206[2] Major League Baseball jerseys found in his home and van were counterfeit.

As to defendant's first contention, the government valued the Super Bowl jerseys at $250 each, which is $10 less per jersey than defendant now argues for.  Accordingly, this objection is moot and should be overruled.

Regarding defendant's second argument, the record establishes well beyond a preponderance of the evidence that defendant knew the 1,206 contested MLB jerseys were counterfeit.  These jerseys were among the 1,410 counterfeit items seized from defendant's van and residence on September 14, 2012, and were found with numerous

---

[2] Although the defendant objected generally to inclusion of the MLB jerseys in the PSR's loss tabulation, the plea agreement makes clear that he in fact disputes his knowledge as to 1,206 of the 1,215 seized MLB jerseys, not the nine MLB jerseys he attempted to deliver to AME Sports on the day of the seizures (Plea Agreement ¶ 6.b.1; chart at PSR ¶ 18).

other admittedly-infringing sportswear items. (PSR ¶¶ 11-13, 18; Plea Agreement ¶ 6.c). There is nothing suggesting these 1,206 jerseys were any different from the nine MLB jerseys defendant delivered to his long-time customer, R.M., at AME Sports the day agents seized all of these jerseys. (PSR ¶¶ 9-11). Defendant admits, as he must, that he knew the nine jerseys he delivered to AME sports were counterfeit, as his business was supplying R.M. and others with counterfeit jerseys for resale. (Plea Agreement ¶ 2). It defies credulity that defendant attempted to sell R.M. nine counterfeit Minnesota Twins jerseys he knew to be counterfeit but somehow believed 1,206 jerseys identical or nearly identical to these and in his possession on the same day were legitimate. (See Aff. of Jonathan Duzan (attached hereto as Exhibit 1) ¶ 2).

Additionally, CAPS, experts in identification of counterfeit sports marks, analyzed these jerseys and determined they were counterfeit based on misspelling, lack of hologram authenticity, and poor quality, all things someone with defendant's years of experience in trafficking in counterfeit jerseys would have recognized. (Id. ¶¶ 1, 4). And defendant himself said in his interview the day of the searches that he knew how to detect fakes, and he never contested the seizure or forfeiture of any of these jerseys. (Id. ¶ 2). Finally, defendant offers nothing other than his bald assertion that he believed these jerseys to be legitimate. The totality of the evidence and common sense belie this argument and the Court should hold defendant accountable for all 1,215 MLB jerseys included in the infringement calculation. As such, the resulting adjusted offense level is level 19 (8+12+2-3). (PSR ¶ 37).

### B. Criminal History, Guideline Range and Restitution

The parties and the probation office calculated defendant as falling within criminal history category III. (PSR ¶ 59; Plea Agreement ¶ 6.d). Applying category III to a total adjusted offense level of 19, results in a guideline range of 37 to 46 months of imprisonment. (PSR ¶ 70; Plea Agreement ¶¶ 6.b.1, 6.e). As noted above, the government agrees with this conclusion, while defendant asserts an applicable range of 30-37 months. (PSR ¶ 3). The parties and the PSR agree that the Mandatory Victims Restitution Act applies and requires full restitution to the defendant's victims. (PSR ¶ 127; Plea Agreement ¶ 9). The government concurs with the PSR that defendant shall make restitution in the amount of $69,155.25 to CAPS on behalf of its members, the victims of the infringement. (PSR ¶¶ 21, 127; see CAPS Victim Impact Statement (previously provided to defendant and included with the Court's courtesy copies of this memorandum)).

Based on the above and in consideration of the factors of 18 U.S.C. § 3553(a), the Government respectfully requests this Court sentence the defendant to 37 months' imprisonment.

### SECTION 3553(a) SENTENCING FACTORS

In addition to determining the applicable advisory sentencing guidelines range, 18 U.S.C. § 3553(a)(4), this Court is required to assess the other applicable sentencing factors under Section 3553(a). Those factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to

provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to victims. 18 U.S.C. § 3553(a). Here, these factors, in particular the characteristics of the defendant, the need to promote respect for the law and to effect adequate deterrence to criminal conduct, support a sentence of 37 months' imprisonment.

A sentence at the bottom of the Guideline range is appropriate in this case based on several facets of the history and characteristics of the defendant. The defendant immediately cooperated with law enforcement and owned up to his crime from the start. This deserves the Court's recognition and consideration in the sentencing determination. However, defendant's past – both distant and recent – demonstrates a consistent pattern of violent and volatile behavior that likewise must factor into his sentence.

Defendant's criminal history is replete with abuse, threats, and dangerous behavior that did not abate until he was arrested in this case. (PSR ¶¶ 42-56, 70-71). From age 21 on, his violations of the law have been numerous and regular, and reveal disturbing violence against others. In February 2014, defendant pushed, punched and strangled a business owner as he demanded money from this victim. (PSR ¶ 70). Defendant told the victim if the money was not paid by the following day "I'm gonna kick your ass" and "I'm going to come back and shoot you if you don't get that money." (<u>Id.</u>). Then again, just a few months prior to his arrest in this case, defendant returned to the business and threatened to kill this same victim, menacing: "What do you think the police are going to do to me? I'm going to visit you again and I'm going to kill you." (PSR ¶ 71).

7

Defendant admonished the victim that self-protection would fail: "A gun ain't going to help you, I'm still going to kill you." (Id.)  Defendant is facing separate charges for fifth degree assault and terroristic threats, respectively, based on these two attacks. (PSR ¶¶ 70, 71).

This recent behavior is consistent with several prior convictions, which stand as additional examples of defendant's patterned behavior and ready resort to violence.  In another demand for money, defendant pushed open the door of a home so hard he broke the window and threated property damage and physical harm to the victim. (PSR ¶ 49).  This resulted in a conviction of criminal damage to property. (Id.).  And defendant has not one, but three, domestic violence-related convictions, including striking an ex-girlfriend in the face and putting a pillow over her head so she couldn't scream; making threatening phone calls to another an ex-girlfriend and her husband; and violating an order for protection the victim had obtained against the defendant. (PSR ¶¶ 44, 46, 48).  Defendant also was convicted of possession of tear gas based on an incident in which he went to family court with a dagger and tear gas in his bag. (PSR ¶ 47).

Additionally, defendant has a serious drug conviction in this Court, where he was convicted of possession with intent to distribute more than 500 grams cocaine and sentenced to 60 months of imprisonment. (PSR ¶ 50). During the search in that case agents found not only cocaine but methamphetamine, marijuana, over $2000 cash, and a semiautomatic handgun. (Id.).  And even after he was apprehended and sentenced, defendant refused to obey rules, incurring violations of halfway house rules and of his supervised release, during which he traveled to Florida to sell the counterfeit Super Bowl

jerseys referenced in this case. (PSR ¶¶ 14, 50; plea agreement ¶ 2).  In sum, defendant has a history of volatile, violent, dangerous behavior that poses threat to the community and calls for a meaningful term of imprisonment.

Defendant's history of substance abuse adds to the concern for public safety.  He admits to using alcohol and cocaine regularly in the past and admitted he used cocaine just a week prior to his detention hearing.  (See Pretrial Services Report).  As anyone in the criminal justice system, indeed in most facets of life, knows, drug and alcohol dependence go hand and hand with crime and violence.  The government hopes a sentence of 37 months in the confines of incarceration would allow defendant to participate in, commit to, and complete a substance abuse program and give him time to maintain sobriety and evaluate his prior choices.

A Guideline sentence is also necessary in this case to deter the defendant from further criminal conduct and to effect general deterrence among others considering committing crimes.  Defendant's words and actions speak volumes.  He disregards and disrespects the law.  (E.g., PSR ¶¶ 50, 71).  He has not been deterred by prior sanctions; indeed, he committed this offense while still under the Court's order of supervision for his federal drug conviction.   A sentence of 37 months would apply appropriate consequences to defendant's actions, promote deterrence and respect for the law, and account for the history and characteristics of defendant, both good and bad.  Such a sentence would be sufficient but not greater than necessary to accomplish federal sentencing goals in this case.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that the Court should sentence the defendant to 37 months' imprisonment.

Dated: April 22, 2015                              Respectfully Submitted,

                                                   ANDREW M. LUGER
                                                   United States Attorney

                                                   *s/Sarah Hudleston*

                                                   BY:  Sarah E. Hudleston
                                                   Assistant U.S. Attorney
                                                   Attorney number 0351489